PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 12-1539

—————————

MYLAN INC.; MYLAN PHARMACEUTICALS INC.,
Appellants

v.

SMITHKLINE BEECHAM CORPORATION, n/k/a
GLAXOSMITHKLINE LLC, d/b/a GLAXOSMITHKLINE;
SMITHKLINE BEECHAM P.L.C., n/k/a SMITHKLINE
BEECHAM, LIMITED; SMITHKLINE BEECHMAN
(CORK) LIMITED, successor to SB PHARMCO PUERTO
RICO, INC.; APOTEX INC; and APOTEX CORPORATION

—————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-10-cv-04809)
District Judge:  Honorable Joel A. Pisano

—————————

Argued:  January 8, 2013

Before:  SCIRICA, AMBRO, and FUENTES, Circuit Judges

(Opinion filed: July 22, 2013)

Gary D. Adamson, Esquire
Michael E. Johnson, Esquire  (Argued)
Alston & Bird
90 Park Avenue, 12th Floor
New York, NY  10016-1387

       Counsel for Appellants

William H. Burgess, Esquire
F. Christopher Mizzo, Esquire  (Argued)
Michael A. Pearson, Esquire
Kirkland & Ellis
655 15th Street, N.W., Suite 1200
Washington, DC  20005

Thomas A. Cunniff, Esquire
Fox Rothschild
997 Lenox Drive
Princeton Pike Corporate Center, Building 3
Lawrenceville, NJ  08648

Eric I. Abraham, Esquire  (Argued)
Christina L. Saveriano, Esquire
Hill Wallack
202 Carnegie Center, 2nd Floor
Princeton, NJ  08543

       Counsel for Appellees

_____

OPINION  OF  THE  COURT

_____

AMBRO, Circuit Judge

This case involves competing rights over the pharmaceutical paroxetine hydrochloride controlled release tablets ("paroxetine") in generic form. Defendant/Appellee GSK[1] holds patent and FDA rights to market and sell paroxetine for the treatment of depression under the brand name Paxil CR.[2] As part of a 2007 settlement agreement, GSK granted Plaintiff/Appellant "Mylan" (jointly and severally referring to Mylan Inc. and Mylan Pharmaceuticals Inc.) certain rights to produce, market, and sell generic paroxetine. Then, in 2010, GSK agreed—as part of an unrelated settlement—to begin supplying Defendant/Appellee "Apotex" (jointly and severally referring to Apotex Inc. and Apotex Corp.) with GSK-produced generic paroxetine for marketing and sale to downstream customers. Mylan filed suit against GSK and Apotex, claiming the 2010 agreement

---

[1]  "GSK" refers collectively to SmithKline Beecham Corp., n/k/a GlaxoSmithKline LLC, d/b/a GlaxoSmithKline; SmithKline Beecham P.L.C., n/k/a SmithKline Beecham, Ltd.; and SmithKline Beecham (Cork) Ltd., successor to SB Pharmco Puerto Rico, Inc.

[2]  GSK maintains patent rights under U.S. Patent No. 7,229,640 (expires July 2016), and is authorized to market and sell paroxetine pursuant to FDA-approved New Drug Application ("NDA") No. 02-0936. An NDA must provide, *inter alia*, "a statement of the drug's components, scientific data showing that the drug is safe and effective, and proposed labeling describing the uses for which the drug may be marketed." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1676 (2012).

violated its licensing agreement with GSK, which did not permit GSK to provide its own form of generic paroxetine to another generic drug company—such as Apotex—to be marketed and sold in direct competition with Mylan.

The District Court found that the terms of the GSK-Mylan agreement were unambiguous, and they did not limit to whom GSK was permitted to market and sell its own version of generic paroxetine. It thus held GSK did not breach its agreement by agreeing to provide Apotex with GSK-produced generic drugs, and granted summary judgment against Mylan on all claims. For the reasons that follow, we reverse the Court's grant of summary judgment on the breach-of-contract cause of action against GSK, and remand for the parties to proceed to trial on that claim. We affirm its grant of summary judgment on all other claims. Because the District Court denied GSK's motion to strike Mylan's expert damages report as moot on the basis of its summary judgment rulings, we will vacate that denial for reconsideration on remand.[3]

---

[3] The parties have moved to file under seal Volumes III through VII of the Joint Appendix and unredacted versions of their briefs, as well as to continue impoundment of the portions of the certified record filed under seal in the District Court. We are satisfied there is good cause to seal these records—*i.e.*, to protect the parties' confidential proprietary business and competitive interests. *See Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070–71 (3d Cir. 1984). Thus, we grant the motions to seal and limit our discussion to those underlying facts and evidence already disclosed during the litigation and not under seal.

## I. BACKGROUND

### A. GSK-Mylan Patent Settlement & License Agreement

In June 2007, GSK sued Mylan for patent infringement after Mylan sought FDA approval to introduce a generic version of paroxetine into the market before GSK's patent had expired.[4] The parties settled the case shortly thereafter,

---

[4] Once a new pharmaceutical has been approved for sale, there are two means by which a generic form of the drug may be introduced into the market. First, a generic company can file an Abbreviated New Drug Application ("ANDA"), which seeks FDA authorization to produce and sell a generic version of an already approved drug product. *See* 21 U.S.C. § 355(j); 21 C.F.R. § 314.92–99. Second, the brand company may produce an "authorized generic" ("AG") under its approved NDA, which is labeled as generic and sold at a lower price than its branded equivalent, to compete with other generic products on the market. *See* 21 U.S.C. § 355(t)(3).

An ANDA filer must certify that the generic drug will not infringe on any patent covering the pioneer drug. One way it may do this—as was done by Mylan here—is by challenging the validity of the relevant patent via a "Paragraph IV" certification. *See id.* § 355(j)(2)(A)(vii)(IV). For a more thorough discussion of the patent obligations with respect to generic applicants, see Abbreviated New Drug Application Regulations; Patent Exclusivity Provisions, 59 Fed. Reg. 50,338 (Oct. 3, 1994) (codified at 21 C.F.R. pt. 314). *See also Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 32–34 (D.D.C. 2000) (discussing the development of

signing a Patent License and Settlement Agreement in August 2007 ("License Agreement"). Section II(c) of the License Agreement granted Mylan exclusive rights to market and sell generic paroxetine for the remaining life of GSK's patent (*i.e.*, nearly nine years of complete generic exclusivity). This included manufacturing, marketing, and selling Mylan's own generic paroxetine drug products, as well as sales rights for AG paroxetine manufactured by GSK. Mylan's generic rights were exclusive "even [as] to GSK." *See* J.A. at 51 (quoting License Agreement, Section II(c)).

The parties submitted to the Federal Trade Commission ("FTC") the License Agreement, in accord with its terms and as required by federal law. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, Title XI §§ 1112–13, 117 Stat. 2066, 2461–63 (codified at 21 U.S.C. § 355). In response to concerns raised by the FTC about the length and absoluteness of Mylan's exclusive generic rights, the parties amended the License Agreement in September 2007 (the "Second Amendment"; the First Amendment to the License Agreement is irrelevant to this opinion). It provided two specific exceptions to the complete generic exclusivity provided under the License Agreement. First, in the settlement of subsequent patent litigation with other third-party companies that had filed ANDAs for generic paroxetine, GSK was permitted to grant nonexclusive licenses as part of a settlement agreement with those third parties:

> If GSK receives a Third Party Notification and GSK initiates an action for patent infringement, GSK can enter into a settlement agreement with

generic drug-approval guidelines and ramifications of a Paragraph IV certification).

respect to such action at any time and Mylan agrees to waive its exclusivity under Section II(c) in order to permit GSK under such settlement agreement to grant such Third Party a non-exclusive license under the GSK Patents to sell Generic Paroxetine Product(s) in the dosage form(s) specified in the Third Party's ANDA . . . .

J.A. at 51 (quoting Second Amendment, Section II(e) para. a) (the so-called "ANDA Clause").

Second, and more relevant here, GSK (or a GSK affiliate) was entitled to market and sell AG paroxetine beginning two years after Mylan launched its generic products:

Also, GSK or its Affiliate may commence marketing and selling generic paroxetine hydrochloride controlled or modified release products pursuant to its Paxil® CR NDA ("Authorized Generic Products") at the end of the second year after Mylan launches its Generic Paroxetine Products.

Id. (quoting Second Amendment, Section II(e) para. b) (the "Authorized Generic Clause").

The Second Amendment alleviated the FTC's exclusivity-related concerns. Thereafter, Mylan launched its generic paroxetine drug products in May 2008.

## B. GSK-Apotex Antitrust Litigation & Supply Agreement

In May 2010, GSK settled an unrelated antitrust lawsuit brought against it by Apotex. The terms of the

7

settlement agreement provided for a $300 million cash payment to Apotex; in addition, Apotex was entitled to a guaranteed minimum of $180 million to be earned through the sale of GSK products (*i.e.*, "in-kind transfers"). During negotiations regarding the potential products GSK would provide for the in-kind transfers, Apotex became aware that Mylan (i) had certain licensing rights with respect to paroxetine, for which Mylan paid GSK royalties, and (ii) was the only generic paroxetine market participant. While it refused Apotex's request for a copy of the License Agreement due to confidentiality concerns, GSK did advise Apotex that its supply obligation to Mylan ended by June 2010. *See* J.A. at 8.

The parties agreed that one of the GSK-supplied products from which Apotex would produce sales revenues would be AG paroxetine. Thus, to implement the in-kind transfer arrangement, GSK and Apotex subsequently entered into an Exclusive Supply & Distribution Agreement for AG paroxetine ("S&D Agreement"). *Id.* Apotex subsequently began sales activities for AG paroxetine, which led to the filing by Mylan of this lawsuit in September 2010.

### C. District Court Proceedings

Mylan brought claims against GSK for breach of contract and the implied covenant of good faith and fair dealing, and against Apotex for tortious interference with and inducement to breach a contract. The crux of Mylan's claims was that the terms of the amended License Agreement only allowed third-party generic companies that had filed their own ANDAs to sell generic paroxetine, and that, even after Mylan's two-year exclusivity period, only GSK was permitted to engage in marketing and sales activities for AG paroxetine that were directed to downstream customers—*e.g.*, "wholesalers, retailers, pharmacy chains, mail order

8

pharmacies, pharmacists, hospitals, clinics, and managed market companies." *See* Mylan Br. at 43. Mylan asserted this was consistent with its position during negotiations—that to allow otherwise would force it to compete against other generic companies that were not required to expend the time and resources to secure FDA approval by filing an ANDA. Mylan thus argued that GSK violated the License Agreement by entering into the S&D Agreement and supplying Apotex—an intermediary drug company—with GSK-produced AG paroxetine for marketing and sale in competition with Mylan.[5]

The District Court granted summary judgment in favor of GSK and Apotex. In doing so, it ruled that the Authorized Generic Clause of the Second Amendment was clear and unambiguous, thus permitting GSK to market and sell AG paroxetine to whomever it wished, including Apotex, after Mylan's two-year period of generic exclusivity. Hence the Court declined to consider any of the intent evidence submitted by the parties, as well as the industry and custom evidence offered by Mylan, on the ground that such evidence "cannot be used 'to create an ambiguity where none exists' in order to preclude summary judgment." *Id.* at 13 (quoting *Int'l Union, UAW v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999)).

---

[5] Apotex undisputedly did not come within the scope of the ANDA Clause, as it never prepared an ANDA for generic paroxetine, nor was it sued by GSK for infringing patents purportedly covering paroxetine. And with respect to the Authorized Generic Clause, Apotex is a "Third Party" and not a GSK affiliate as defined by the License Agreement.

9

The Court thus held GSK did not violate the License Agreement or, in the absence of proof of bad motive, the implied covenant of good faith and fair dealing. Because it found no protectable contract right, the Court also held Mylan's claims against Apotex necessarily failed; this meant that GSK and Apotex were entitled to judgment as a matter of law on all claims brought by Mylan.

On appeal, Mylan challenges the District Court's interpretation of the Authorized Generic Clause and its consequent grant of summary judgment in favor of (i) GSK on Mylan's contractual claims, and (ii) Apotex with respect to Mylan's tortious interference claim.[6]

## II.    DISCUSSION[7]

### A.    Standard of Review

Our review of the grant or denial of summary judgment is plenary, and we "apply[] the same standard as the district court." *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 415

---

[6]    Mylan does not raise on appeal its inducement to breach claim against Apotex; thus, the issue is waived. *See, e.g.*, *In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003).

[7]    The District Court had subject matter jurisdiction under 28 U.S.C. § 1332. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

(3d Cir. 2011) (citing *Ruehl v. Viacom, Inc.,* 500 F.3d 375, 380 n.6 (3d Cir. 2007)). "Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Ruehl*, 500 F.3d at 380 n.6 (quoting *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 322 n.2 (3d Cir. 2005)) (internal quotation marks omitted).

In a contract interpretation action, summary judgment is appropriate only where the contractual language is unambiguous—*i.e.*, "subject to only one reasonable interpretation." *See Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999) (citations omitted). "If the nonmoving party presents a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Newport Assocs. Dev. Co. v. Travelers Indem. Co.,* 162 F.3d 789, 792 (3d Cir. 1998) (citing *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir. 1987); *Landtect Corp. v. State Mut. Life Assurance Co.,* 605 F.2d 75, 80 (3d Cir. 1979)). Whether a contract is ambiguous is an issue of law subject to plenary review. *Sumitomo Mach. Corp. v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir. 1996) (citing *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993)).

Under New Jersey law (which the parties do not dispute governs here), courts must always "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract" when making ambiguity determinations. *Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 346 (N.J. 2006). "Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity." *Sumitomo Mach. Corp.*, 81 F.3d at 332

11

(quoting *Atl. N. Airlines, Inc. v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953)). In aid of interpretation, courts should consider, for example, "the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Kearney PBA Local No. 21 v. Town of Kearney*, 405 A.2d 393, 400 (N.J. 1979). Thus, courts must consider all relevant evidence to determine if any ambiguity exists and, if the contested provisions fall in that gray area, summary judgment is improper.[8]

## B. Breach of Contract

---

[8] Federal law is consistent with this approach. *See, e.g.*, *Int'l Union, UAW v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir. 1990) ("'In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings.'" (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir. 1986))); *Teamsters Indus. Emps.*, 989 F.2d at 135 (instructing that a court construing contract language is not permitted "simply [to] determine whether, from [its] point of view, the language is clear[, but instead must] 'hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings'" (last alteration in original) (quoting *Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991))).

The District Court concluded that, as amended, the License Agreement did not limit to whom GSK could market and sell AG paroxetine after Mylan's two-year period of generic exclusivity. Mylan argues there is a reasonable alternative interpretation—*i.e.*, that the Authorized Generic Clause only allowed GSK to market and sell AG, whereas supplying a third-party generic competitor with GSK-produced AG paroxetine for marketing and sale to downstream customers was impermissible—and thus the District Court erred in refusing to consider the evidence offered in support of this reading. For the reasons explained below, we agree.

In support of its alternative meaning, Mylan presented various forms of intent evidence.[9] First, it submitted extrinsic evidence of the License Agreement's negotiations, including the parties' respective objectives and their actions taken to mollify the FTC's concerns about Mylan's nine-year exclusivity pre-Second Amendment. Mylan also offered custom and usage evidence, including expert testimony regarding industry understanding of the phrase "marketing and selling."[10] Mylan pointed as well to rules of contract

---

[9] In light of our decision that determining the meaning of the Authorized Generic Clause is an issue properly left to the jury, it is not necessary to engage in a protracted review and analysis of this evidence. Accordingly, we provide only an abridged discussion here.

[10] In a specialized and highly technical field, such as the pharmaceutical industry, trade usage evidence is particularly instructive when interpreting the meaning of disputed contractual language. *See, e.g.*, *USX Corp. v. Liberty Mutual Ins. Co.*, 444 F.3d 192, 198 n.11 (3d Cir. 2006) (applying Pennsylvania law).

construction—*e.g.*, affording meaning to the use of different words (in particular, "affiliate" and "third party") and reading provisions in light of other relevant sections of the License Agreement (specifically the section regarding the consequences of a "Negative Response" from the FTC)—to support its interpretation of the Authorized Generic Clause.

The District Court needed to take into account the alternative meaning suggested by Mylan, and the nature of the objective evidence offered in support of its suggested meaning, to determine whether that extrinsic evidence "demonstrate[d] the existence of a latent ambiguity." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 22 (Pa. Super. Ct. 1995)) (internal quotation marks omitted). Yet it refused to consider the extrinsic evidence submitted by Mylan. New Jersey law, which is expansive as to extrinsic evidence in aid of contract interpretation, requires otherwise. *See Conway*, 901 A.2d at 347 ("permit[ting] a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties . . . [and] to uncover the true meaning of contractual terms"). The District Court was not free to reject such evidence on the ground that it found the agreement on its

Mylan asserts that its industry custom, practice, and usage evidence was uncontested. However, while GSK did not offer competing expert evidence on this subject, it did produce its own evidence of industry practice with respect to placing AG drugs on the market. To the extent GSK's evidence is deemed reliable and relevant to the interpretation of the License Agreement, it too should be considered by the jury.

14

face free from ambiguity. *See Atl. N. Airlines*, 96 A.2d at 656.[11]

This is especially so when the alternative reading of the contested language suggested by Mylan was both reasonable and supported by objective evidence of the parties' intentions. This demonstrates latent ambiguity in the contractual language. Hence summary judgment was not appropriate on Mylan's breach-of-contract cause of action. "The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1113–14 (N.J. Super. Ct. App. Div. 2002). The District Court's grant of summary judgment in favor of GSK on Mylan's breach-of-contract cause of action is therefore reversed and remanded for that claim to proceed to trial.[12]

---

[11] We note that the language quoted by the District Court from *International Union, UAW v. Skinner Engine Co.* about "creat[ing] an ambiguity where none exists," 188 F.3d at 145, does not apply here. As an initial matter, that case involved the interpretation of a collective bargaining agreement under Pennsylvania law. Further, the statement was made in the context of rejecting self-serving testimony that contradicted, rather than interpreted, facially unambiguous contractual language. *Id.* In contrast, Mylan offered various forms of objective evidence in support of its reading, and we believe this evidence is interpretive rather than contradictory as to the License Agreement's terms.

[12] GSK also asserts Mylan failed to prove damages caused by its alleged breach of the License Agreement.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

The District Court identified two grounds on which Mylan's breach of the implied covenant of good faith and fair dealing claim failed. First, to the extent Mylan's cause of action was based on on its right to preclude third-party generic companies from selling AG paroxetine, the Court rejected the claim because it had already determined the contract language unambiguously did not give Mylan that

---

GSK's damages argument does not establish that it was entitled to judgment as a matter of law on the contract claim. First, Mylan submitted an expert report on damages it claims to have suffered from Apotex's sales of AG paroxetine in the District Court, which GSK moved to strike on the ground that the report relied on documents and opinions that Mylan withheld during discovery. The Court denied the motion as moot after finding GSK was entitled to judgment as a matter of law on Mylan's contractual claims. Because that motion has not yet been addressed by the District Court, we will not speculate on its merits but rather will allow the Court to consider it on remand. Second, GSK suggests several alternative factual scenarios that it claims would also have generated generic paroxetine market competition and, accordingly, the same "harm" to Mylan. Whether and to what degree GSK's hypothetical scenarios would have affected Mylan's profits under the License Agreement—and thus its damages from a breach thereof—is a disputed issue of material fact to be resolved at trial.

right. Given our holding with respect to the contract claim, this reasoning is without continuing force.

The Court also found, however, that Mylan had failed to prove that GSK acted with the requisite bad motive or intent when entering into the S&D Agreement with Apotex. *See Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001) (requiring that a party have acted "with the objective of preventing the other party from receiving its reasonably expected fruits under the contract" to establish a breach of the implied covenant). Mylan retorts that bad motive turns on the parties' intentions, and thus is a question for the jury, citing *Seidenberg v. Summit Bank*, 791 A.2d 1068 (N.J. Super. App. Ct. Div. 2002). However, *Seidenberg*'s reference to the "trier of fact" was meant to illustrate that defining bad faith is "unrealistic," not to relieve a party of its obligation to set out sufficient evidence of bad intention—*i.e.*, to demonstrate an issue of material fact—in order to survive a motion for summary judgment. *Id.* (concluding it "best to entrust the drawing of [the bad faith] line to trial judges and juries" but admonishing against "an unduly expansive version of bad faith").

While the S&D Agreement arguably frustrated expected profits of Mylan from sales of its generic products by introducing a direct third-party competitor, it has not produced any evidence that GSK entered into that subsequent agreement with bad faith or improper motive. *See id.* Accordingly, we affirm the District Court's grant of summary judgment on Mylan's good faith and fair dealing claim.

### D.    Tortious Interference with a Contract

As to the alleged tortious interference of contract by Apotex, the District Court again rested its dismissal of this claim on its conclusion that Mylan had no protectable right to

17

prevent third parties from selling AG paroxetine after its two-year period of exclusivity. With that absence, Mylan failed to make the threshold showing of an existing or prospective contractual relationship required for a tortious interference claim. *See, e.g.*, *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989) (*per curiam*)). Given our determination that Mylan arguably had a protectable contract right, we cannot conclude that was a proper ground to conclude Apotex was entitled to judgment as a matter of law on this claim.

Summary judgment was nonetheless appropriate here. Under New Jersey law, a plaintiff must demonstrate interference with a contractual relationship that is knowing, intentional, and wrongful. *See Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) (citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir.1992); *Printing Mart-Morristown*, 563 A.2d at 37). Mylan falls short of establishing that interference here.

As an initial matter, the record does not suggest that Apotex had knowledge of Mylan's asserted contractual right to preclude other generic pharmaceutical companies from marketing and selling AG paroxetine. Actual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference. *Id.*; *see also* Restatement (Second) of Torts § 766 cmt. i (1979) (requiring that an actor "have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract" to incur liability).[13] It is undisputed that Apotex never saw the

---

[13] New Jersey has adopted the Restatement's definition of tortious interference with a contract. *See Matrix*

License Agreement, and there is no evidence in the record that it knew any specifics with regard to the Agreement's terms during the S&D negotiations with GSK. And without knowledge of the specific contractual right, Apotex cannot be deemed to have intentionally interfered with that right.

Mylan nonetheless asserts that the knowledge requirement was satisfied here based on evidence establishing, in effect, willful blindness on the part of Apotex. Assuming, for the sake of argument, that showing a deliberate indifference to the terms of a contract would be sufficient to satisfy the first tortious interference element, the record merely demonstrates that Apotex understood Mylan had licensing rights to sell a generic form of paroxetine. Mylan has not pointed to any evidence indicating Apotex believed that Mylan's licensing rights were exclusive as to other third-party sellers or that Apotex's resale of AG paroxetine would otherwise infringe the Licensing Agreement. *See, e.g.*, *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002) ("General knowledge of a business relationship is not sufficient; the defendant must have specific knowledge of the contract right upon which his actions infringe." (citing *Matrix Essentials, Inc.*, 870 F. Supp. at 1247)).

And even if we were to impute knowledge to Apotex, Mylan has failed to establish the requisite "malice" to sustain this cause of action. Where the parties to a tortious interference claim are business competitors—such as Mylan and Apotex—establishing intentional and malicious interference requires evidence that "one competitor interfere[d] with another's economic advantage through conduct which [wa]s fraudulent, dishonest, or illegal." *Ideal*

Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F. Supp. 1237, 1247 (D.N.J. 1994) (citations omitted).

*Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 936 (N.J. Super. Ct. App. Div. 1995) (citations omitted). There is no record indication that Apotex secured its S&D Agreement with GSK through fraud, dishonesty, or illegal conduct of any kind.[14] Even construed in the most favorable light, the evidence was lacking to substantiate Mylan's tortious interference cause of action, and summary judgment was therefore properly granted to Apotex.

\* \* \* \* \*

We hold that summary judgment was inappropriate as to the breach-of-contract claim against GSK; thus we reverse and remand for the parties to proceed to trial on that claim. We also vacate the denial of GSK's motion to strike as moot and remand to permit the District Court to consider that motion on the merits. On all other grounds, we affirm the Court's judgment.

---

[14] A breach alone is insufficient to establish that a third party is liable for tortious interference. *See* Restatement (Second) of Torts § 766B cmt. e (explaining that interference resulting from a breach of contract does not amount to tortious behavior unless it was wrongful, which turns on the actor's intent to interfere).