**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2759
_____

THE UNITED STATES DEPARTMENT OF TRANSPORTATION, ex rel. AUGUST
W. ARNOLD, an individual,
Appellant

v.

CMC ENGINEERING; M. A. BEECH; MICHAEL BAKER, JR., INC.; SAI
CONSULTING ENGINEERS, INC.; ERDMAN ANTHONY ASSOCIATES, INC.; L.
ROBERT KIMBALL & ASSOCIATES, INC.; MACKIN ENGINEERING; MCTISH,
KUNKEL & ASSOCIATES; VE ENGINEERING, INC.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-03-cv-01580)
District Judge: Hon. Cathy Bissoon
_____

Submitted Under Third Circuit LAR 34.1(a)
May 16, 2014
_____

Before: SMITH, VANASKIE, and SHWARTZ, Circuit Judges.

(Filed: June 02, 2014)
_____

OPINION
_____

SHWARTZ, Circuit Judge.

In this qui tam action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, relator August W. Arnold asserts that the District Court improperly granted summary judgment against him on his claim that CMC Engineering, Inc. ("CMC") submitted false claims for payment to the federal government via the Pennsylvania Department of Transportation ("PennDOT") for the services of inspectors who worked on highway projects. Arnold claims that the inspectors who worked on the projects did not have the qualifications that entitled them to the pay rates claimed. Because the contracts setting forth the qualifications necessary to trigger each pay rate were ambiguous and this undermines Arnold's ability to prove that even arguably inaccurate claims were knowingly made, we will affirm.

I

As we write principally for the benefit of the parties, we recite only the essential facts and procedural history. Arnold was a PennDOT Assistant Construction Engineer who helped oversee the selection of private engineering firms that performed inspection services on PennDOT's federally funded highway projects. PennDOT sought services for different classes of inspectors based upon their experience, training, and certifications, and set pay rates that increased based upon the inspectors' credentials. PennDOT's contract included two provisions that set forth the types and number of inspectors needed for a particular project, the credentials each type of inspector was required to possess, and the corresponding pay rate. In the first provision on this topic, the contract stated that each inspector needed to either meet the minimum standard set by the inspectors'

2

national accreditation association, the National Institute for Certification in Engineering Technologies ("NICET"), or a state equivalent. The contract then set forth, in what is referred to as Table B, various combinations of field experience and certifications necessary for each type of inspector. The contract also set forth, in what is referred to as Table C, an alternative means to satisfy the qualifications through combinations of formal education and field experience.

The very next section of the contract states that "[t]he entire Engineer's inspection staff shall meet the qualifications and requirements as shown in Attachment 'A' . . . ." App. 274. Attachment A contained a job description for each inspector classification and listed minimum experience requirements, some of which differed from those set forth in the Tables and all of which included a "catchall" provision that was not set forth in Tables B and C that allowed an inspector to satisfy the qualification requirements for the position with "[a]ny equivalent combination of experience and/or training which provides the required knowledge, skills, and abilities." App. 291-301. This "catchall" was relied upon in submitting credentials to PennDOT in justifying certain inspectors' pay rates.

Arnold became concerned about the relationship between PennDOT and the engineering firms and conducted a review of the qualifications of the firms' inspectors. Arnold believed that many inspectors, including those from CMC, lacked or overstated the credentials necessary to qualify them for the hourly rates at which they were being

billed[1] and filed an FCA complaint. The United States declined to intervene and CMC moved to dismiss, arguing that Arnold was required to plead a closer connection between the allegedly false claims and payment by the federal government. U.S. Dep't of Transp., ex rel. Arnold v. CMC Eng'g, 564 F.3d 673, 675-76 (3d Cir. 2009). The District Court granted the motion, but this Court vacated the District Court's dismissal and remanded, holding that "Arnold's claims may be actionable under the FCA" if the federal government "was involved in the disbursement of funds from PennDOT to the consultants upon submission of the fraudulent claims in any way . . . ." Id. at 679. After discovery, CMC moved for summary judgment. The District Court granted CMC's motion, holding in part that "Arnold has failed to present evidence sufficient to show that CMC had actual knowledge" about, or that it had "acted with deliberate indifference or reckless disregard" with respect to, the alleged deficiencies of its inspectors' qualifications. App. 13. Arnold appeals.

---

[1] Arnold reported his findings to PennDOT's central office, the Pennsylvania Inspector General's Office, and the United States Department of Transportation. PennDOT's audit revealed that CMC "had in fact, provided and billed [PennDOT] for individuals who did not possess the requisite experience and credentials . . . and submitted resumes that misrepresented the experience level, certification, licensure, and or academic qualifications of the requisite inspectors, in the amount of $67,849." App. 665. As a result, PennDOT initiated debarment proceedings against CMC. PennDOT and CMC reached a settlement agreement pursuant to which CMC paid PennDOT $61,064.10, and which stated that CMC had submitted "complete and accurate" information to PennDOT and had not acted "in any deceptive, false, [or] misleading way" in its dealings with PennDOT. App. 667-68.

## II

The District Court had jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. This Court's "review of the grant or denial of summary judgment is plenary . . . ." Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We apply the same standard the District Court applied, viewing facts and making reasonable inferences in the non-moving party's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005).

## III

### A

As a preliminary matter, we must address the parties' arguments regarding Arnold's status as the "original source" of information concerning CMC's allegedly false claims, as this requirement is jurisdictional. Rockwell Int'l Corp. v. United States, 549 U.S. 457, 467-70 (2007). An "original source" under the FCA is an individual who either voluntarily discloses information to the federal government prior to a public disclosure or "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the [federal government] before filing an [FCA] action . . . ." 31 U.S.C. §3730(e)(4)(B). The District Court analyzed this issue in detail at the motion to dismiss stage, and we agree

with its conclusion that Arnold qualifies as an "original source" under the FCA with respect to his allegations about CMC's request for payment for inspectors at rates not commensurate with their experience, as Arnold directly and independently reviewed the credentials of CMC inspectors and voluntarily disclosed his findings to the federal government.[2] U.S. Dep't of Transp. ex rel. Arnold v. CMC Eng'g, 745 F. Supp. 2d 637, 644-46 (W.D. Pa. 2010). Thus, we can proceed to consider the merits of Arnold's FCA claim.

B

The FCA makes it unlawful for any person to "knowingly present[], or cause[] to be presented,[3] a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A),[4] or to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to[5] a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B).[6]

---

[2] CMC contends that Arnold was not the original source with respect to certain specific inspectors, but this does not undermine his status as the original source concerning CMC's alleged practice.

[3] The parties dispute whether Arnold has waived his "presentment" claim. Because the same scienter requirement applies to and defeats all of Arnold's FCA claims, his claim would fail even if we were to conclude it was not waived.

[4] The statutory citations are to the FCA as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA").

[5] The phrase "material to" was inserted as an amendment to the FCA by FERA, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

[6] Prior to its amendment by FERA, the FCA applied to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . ." 31 U.S.C. § 3729(a)(2) (pre-FERA) (emphasis added). The Supreme Court suggested that § 3729(a)(2)'s use of "to get" created an intent requirement. S. Rep. No. 111-10, at 11 (2009); see Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662, 668-69 (2008)

To establish an FCA claim, a plaintiff must prove that: "(1) the defendant presented or

caused to be presented to an agent of the United States a claim for payment; (2) the claim

was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."

U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 304-05 (3d Cir. 2011)

(internal quotation marks omitted).  There is no dispute CMC presented claims to

PennDOT for payment for work on federally funded projects.  At issue is whether CMC

knowingly submitted false or fraudulent claims.[7]  The FCA defines "knowing" and

"knowingly" to mean acting with actual knowledge, deliberate ignorance, or reckless

---

("'To get' denotes purpose, and thus a person must have the purpose of getting a false or
fraudulent claim 'paid or approved by the Government' in order to be liable under
§ 3729(a)(2).").  FERA replaced the words "to get" with the words "material to" to make
clear that the statute's focus was on the nature of the statement made to the government
and not the intent of the person making the statement.  U.S. ex rel. Wilkins v. United
Health Grp., Inc., 659 F.3d 295, 304 n.12 (3d Cir. 2011).  We have not yet decided
whether FERA applies retroactively, see id. at 303-04 (declining to resolve retroactivity),
and need not do so here.  Nonetheless, because FERA did not change the FCA's
requirement that the defendant's conduct be "knowing" and does not have a specific
intent requirement, we will apply it as the post-FERA version limits what Arnold must
prove concerning CMC's state of mind.

[7] A claim can be factually false or legally false.  Wilkins, 659 F.3d at 305.  As we
explained in Wilkins,

> A claim is factually false when the claimant misrepresents what goods or
> services that it provided to the Government and a claim is legally false
> when the claimant knowingly falsely certifies that it has complied with a
> statute or regulation the compliance with which is a condition for
> Government payment.

Id.  A legally false claim is, therefore, one based upon a false certification of compliance.
Id.  An express false certification is proven where the claimant has falsely certified that it
is in compliance with relevant regulations that are prerequisites to payment.  Id.  An
implied false certification is proven where the claimant has made a claim for payment
without disclosing that it is not in compliance.  Id. at 305-06.

7

disregard of information's truth or falsity. 31 U.S.C. § 3729(b)(1)(A). Specific intent to

defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

Here, Arnold contends that CMC submitted factually and legally false claims by

knowingly requesting payment at certain rates for certain "inspectors it knew did not

meet credentialing requirements." Appellant Br. 33-34. Arnold argues that the contracts

required inspectors to meet the requirements described in Tables B and C and that

"inspectors who only met the catch all Attachment A standards were not eligible to fill

positions for which certification or certification equivalency was required." App. 828.

Arnold contends that this is the only reasonable interpretation of the contractual

language.

The language of the contracts, however, undermines his assertion that the contract

is susceptible to only one reading. As noted above, Attachment A provides alternative

criteria for inspectors and is in tension with the language set forth in the Tables.[8] For

example, Table B and Attachment A provide inconsistent sets of qualifications for the

"Transportation Construction Manager 1" position. For this position, Table B's "NICET

Certification Requirement" lists 10 years of field experience, a NICET certification as a

_____

[8] PennDOT employees testified that the contract terms were "open to interpretation" and that PennDOT took steps to revise the contracts in an effort to make them clearer. App. 577 ("I made the determination that [the pay rate provisions were] open to interpretation and I made the interpretation that the Attachment A, which is also part of the scope of work, also had specification information in there that helped determine whether an inspector could be paid an inspector's rate or not."); see also App. 513 (stating that granting an inspector a particular classification "based on the phrase any equivalent combination of experience or training" in Attachment A was "a big gray area").

Senior Engineering Technician, a NICET Sub-field of Highway Construction, and a NICET Level of 4, App. 272, whereas Attachment A states that the position requires "NICET Level 4 or Equivalent" and lists several options written in the disjunctive under "Minimum Experience Training," including: "Any equivalent combination of experience and/or training which provides the required knowledge, skills, and abilities," App. 290-92 (emphasis added). Thus, the contracts themselves are ambiguous concerning the credentials required for particular positions that justify particular pay rates.[9]

As a result of that ambiguity, there is no evidence from which a reasonable jury could find CMC "knowingly" made a factually false claim or false certification, as defined under the FCA, by requesting reimbursement for inspectors at rates for which Arnold contends they were unqualified. Cf. U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 984 (D.C. Cir. 2008) (holding that, where relator and defendant "simply disagree about how to interpret ambiguous contract language" and relator could not point to anything that might have dissuaded defendant from its interpretation, "there is no genuine issue as to whether [the defendant] knowingly

---

[9] CMC also asserts "that PennDOT knew of and approved CMC's supposedly culpable conduct," and it urges this Court to apply the "government knowledge inference," a doctrine that can defeat the FCA's scienter requirement where the government knows and approves of the relevant facts underlying the allegedly false claim. Appellee Br. 37-39; see U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 951-52 (10th Cir. 2008) (describing the inference). This Court has not yet adopted that inference and we need not do so here. Further, we question the applicability of the doctrine in this case. Because the FCA applies to false claims submitted to the federal government, the inference would seem to be inapplicable to this case, where there may be evidence of PennDOT's knowledge of the accuracy of CMC's submissions, but no evidence in the record concerning the federal government's knowledge.

presented false claims"); <u>United States v. Basin Elec. Power Coop.</u>, 248 F.3d 781, 805 (8th Cir. 2001) (holding relator had failed to state a claim under the FCA where the defendant's "interpretation and performance under the contract was reasonable" and the relator thus "did not prove that [the defendant] acted with the requisite knowledge"). Thus, the District Court properly granted CMC's motion for summary judgment.

IV

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of CMC.