**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1463
_____

SHELLY SALAK NEWELL,
                                   Appellant

v.

HERITAGE SENIOR LIVING, LLC;
WESTRUM HANOVER, LP, trading as TRADITIONS OF HANOVER

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-12-cv-06094)
District Judge: Hon. Lawrence F. Stengel
_____

Submitted Under Third Circuit LAR 34.1(a)
December 20, 2016
_____

Before: SMITH, Chief Judge, McKEE and SHWARTZ, Circuit Judges.

(Filed: December 20, 2016)

_____

OPINION*
_____

SHWARTZ, Circuit Judge.

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Shelly Salak Newell appeals from the District Court's order granting summary judgment in favor of Defendants on her retaliation claim under the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"). For the reasons set forth below, we will affirm.

I

Defendant Westrum Hanover, LP, t/a Traditions of Hanover ("Traditions"), is an independent living community for seniors that rents apartments and provides certain services to its residents. Defendant Heritage Senior Living, LLC provides management services to Traditions. In October 2010, Newell began working at Traditions as a marketing manager and reported directly to the marketing director, Jennifer Murphy. Newell's job description included "assisting [Murphy] in representing the residence in a positive light, maintaining favorable relationships with hospitals, local physicians, and other marketing and referral sources." Supp. App. 205.

During the first six months of her employment, Newell received generally positive feedback on her performance, but she struggled with using Traditions' computerized sales system and with getting potential residents to visit the community. In April 2011, Newell requested Murphy's permission to run for election to the board of Lehigh Valley Aging in Place ("LVAIP"), a local organization in Traditions' industry. Murphy denied this request, citing concerns about Newell's performance. Around this time, Newell developed a tense working relationship with Murphy and reportedly made critical statements about Murphy at an LVAIP event. Despite the poor working relationship between Newell and Murphy, Newell received a very positive annual performance

2

evaluation from Murphy in October 2011, but Murphy noted that Newell "can be very opinionated and needs to be willing to consider other points of view." Supp. App. 214.

Shortly after Newell started working at Traditions, Newell raised concerns that Traditions' process for evaluating the "appropriateness" of potential residents violated the FHA. Supp. App. 171. She thereafter made specific complaints. In January 2012, Newell told Murphy that Traditions violated the FHA by discriminating against a prospective resident couple because the husband used a wheelchair. Newell also expressed concern about certain draft documents circulating in late February 2012 setting forth guidelines to determine whether a prospective resident was a proper fit for Traditions. One such document contained language indicating that, to be successful in the independent living environment of Traditions, the ideal residents "require minimal or no assistance, medical or otherwise," are independently mobile, capable of feeding and dressing themselves, independent regarding personal hygiene, and responsible for managing their own medications. Supp. App. 228. Another document stated that "[w]e are looking for new residents with a high acuity level" and that the residents needed to be able to take their own medications, get to and from the dining room on their own, transfer in and out of a dining room chair by themselves, and manage any incontinence issues. Supp. App. 247. Newell wrote to Murphy and Diane Nowakowski, Traditions' Executive Director, that these policies were "too subjective and restrictive" and required residents to be "strictly independent," Supp. App. 228, even though Traditions had current residents who required support, and that it therefore appeared that Traditions had different criteria for new residents. Although Newell's written comments did not explicitly reference the

3

FHA, Newell testified that, in the days that followed the circulation of these documents, she specifically told Murphy that the proposed admission guidelines violated the FHA.

By late February 2012, Newell's relationship with Murphy had deteriorated, and Murphy told Newell that she needed to maintain a more positive attitude, show Murphy respect, and take direction from Murphy without pushback. Their working relationship did not improve, and Murphy and Nowakowski met with Newell in late March 2012 to discuss her performance. During the meeting, Murphy and Nowakowski told Newell that she needed to improve her attitude, stop commiserating with the staff and residents, and communicate in a respectful manner with Murphy. Newell was then placed on a 30-day project or "action plan" under Murphy's direct supervision. Supp. App. 273.

Around the same time, Newell anonymously contacted the Fair Housing Council of Suburban Philadelphia and spoke to Megan Bolin. Newell told Bolin that she worked at an independent living community that was refusing to accept new residents in wheelchairs or scooters and had a policy of discouraging disabled people from joining the community. Bolin informed Newell that the practices she described likely violated the FHA.

After Newell's phone call with Bolin, Murphy asked Newell to enter "loss leads"—explanations regarding why a lead on a potential resident was not pursued—into Traditions' computer system, including identifying when a potential resident was deemed inappropriate due to hygiene or mobility issues. Newell informed Murphy that entering this information violated the FHA, and she refused to comply. Murphy dismissed this

exchange as a typical instance of Newell pushing back on her requests and did not inquire as to why Newell felt that entering the loss leads would violate the FHA.

In April 2012, Murphy received a call from a realtor who worked with Traditions' residents to sell their homes. The realtor told Murphy that she had spoken with Newell about a particular couple's house that was about to go on the market, and Newell had indicated that she felt the price was too low. The realtor also told Murphy that Newell's husband, an electrician, had given the couple a quote regarding electrical work to their home. After hearing this story, Murphy told Nowakowski and David Lovitz, the majority partner of Heritage Senior Living, that she felt the situation presented a conflict of interest. Lovitz met with Newell and explained to her that her husband's financial involvement with residents was inappropriate, but he found that Newell was "defiant" in response. Supp. App. 99. Ultimately, however, Newell's husband did not provide a bid or do work for the residents.

In early May 2012, Newell had conversations with Nowakowski regarding the FHA. Nowakowski asked Newell where she obtained her information regarding the FHA, and Newell explained that she learned about the FHA from communications with the Fair Housing Council of Suburban Philadelphia in connection with her previous job. Nowakowski asked for contact information for the Fair Housing Council, and, on May 8, 2012, Newell emailed Bolin's contact information to Nowakowski.

The same day, Newell called Bolin and identified herself and her employer. Newell indicated that she told Traditions personnel that its policies violated the FHA.

5

Newell told Bolin she believed Traditions was retaliating against her for opposing its allegedly unlawful conduct.

Around the same time, Newell once again asked Murphy's permission to become a member of the LVAIP board and Murphy agreed. On May 8, 2012, the LVAIP sent out a newsletter to all members of the organization that included statements from the nominees for the board. Newell's statement indicated that she wanted to become a board member because "[i]t will be challenging in many ways," and then said that the "[m]ost challenging part will be trying to convince my employer that this will be time well spent and more so, great exposure for them." App. 391. Murphy received the newsletter, forwarded it to Nowakowski, and indicated that she found Newell's statement to be "disrespectful" and "negative PR." Supp. App. 320. Nowakowski then sent an email to Lovitz that included Newell's statement. Lovitz responded that it was a "perfect example of the problem," which appears to be a reference to Newell's attitude issues, and that he was considering terminating her. Supp. App. 324.

On May 14, 2012, Nowakowski and Murphy met with Newell and informed her that her statement on her LVAIP application cast Traditions in a negative light by implying that Traditions did not value involvement in LVAIP. They further referenced the conflict of interest issue with Newell's husband and the LVAIP event where Newell had openly criticized Murphy. Newell was then sent home. That evening, Newell contacted Bolin and asked for direction on filing a discrimination claim. The following day, Newell was fired.

6

In October 2012, Newell filed a complaint in the United States District Court for the Eastern District of Pennsylvania, alleging that Defendants retaliated against her in violation of the FHA. The District Court ultimately granted summary judgment in Defendants' favor, concluding that Newell failed to produce sufficient evidence of a causal link between her termination and protected activity and, even assuming a causal link existed, had failed to demonstrate that Defendants' legitimate, non-discriminatory reasons for terminating her were pretextual. Newell appeals.

## II[1]

### A

The FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of" rights under the FHA. 42 U.S.C. § 3617. We examine Newell's FHA retaliation claim under the burden-shifting framework set forth in McDonnell Douglas

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4). We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary. Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013). We apply the same standard as the District Court, viewing facts and making all reasonable inferences in the non-movant's favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

7

Corp. v. Green, 411 U.S. 792 (1973). See Walker v. City of Lakewood, 272 F.3d 1114, 1128 (9th Cir. 2001). Under this framework, a plaintiff must first establish a prima facie case of retaliation by showing that "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (citations omitted). Once the prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citation omitted). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Id. (citation omitted). Once the employer satisfies this "relatively light" burden, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." Id. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. at 764 (citations omitted) (emphasis in original). The plaintiff may discredit the employer's proffered reasons by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate

8

reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,'" and thereby allow a factfinder to conclude that the employer did not act for the proffered reasons. Id. at 765 (citations and emphasis omitted).

B

We will assume for the sake of argument that Newell has established a prima facie case of retaliation. Accordingly, the burden of production shifts to Defendants to come forward with non-discriminatory reasons for the adverse employment action. Here, Defendants provided three legitimate, non-discriminatory reasons to justify Newell's termination: (1) Newell's LVAIP board application cast Traditions in a negative light, in violation of Newell's core job function to represent Traditions in a positive light; (2) Newell created a conflict of interest by involving herself and her husband's electrical business in a resident's sale of property; and (3) Newell displayed a poor attitude and a chronic pattern of insubordination and disrespect for her superiors. These reasons, taken as true, satisfy Defendants' burden of production. Therefore, the burden returns to Newell, and we will now consider whether Newell has come forth with sufficient evidence to show that all of these reasons were pretextual.

Newell argues that her comment about Traditions on her LVAIP board application is an implausible basis for her termination because: (1) she received permission to submit an application for the LVAIP board; (2) her statement in her application was true because Murphy lacked enthusiasm about LVAIP; and (3) another employee cast Traditions in a negative light by telling a prospective resident that she could not live at Traditions because she used a wheelchair, yet she did not face discipline. **Appellant's Br. 45-46**.

9

First, the fact that Newell received permission to file an application for the LVAIP board is irrelevant because it does not indicate that Defendants would have approved of the statement Newell made on her application. Second, it is irrelevant whether the negative statement in Newell's application was a true statement about Murphy's attitude toward LVAIP. Defendants took issue with Newell's statement not because it was false but because the statement indicated that Defendants did not believe LVAIP was a valuable organization. Even assuming Defendants did not value LVAIP, Defendants reasonably would not want this view shared with other professionals in their industry. Third, the comparison to her coworker's statement is unpersuasive. While the statement is troubling, it was made privately to a potential resident, whereas Newell's statement was viewed by the entire membership of LVAIP and publicly embarrassed Defendants. Therefore, there is no inconsistency between Defendants' treatment of Newell and her colleague.

Because Newell must establish that each of the employer's proffered reasons was pretextual, Fuentes, 32 F.3d at 764, and Newell has not established that Traditions' decision to terminate her based on the statements in her LVAIP application was pretextual, Newell has failed to carry her burden. Accordingly, the District Court correctly held that Newell failed to produce sufficient evidence to demonstrate that all of Defendants' proffered legitimate, nondiscriminatory reasons for her termination were pretextual.[2]

---

[2] Fuentes suggests that a plaintiff may be absolved from discrediting each legitimate reason if the employer proffers "a bagful of legitimate reasons" and the

Moreover, the record here does not reflect the type of temporal connection between her comments about FHA compliance and her termination sufficient to infer that the employer's proffered legitimate reason for termination was pretextual. See, e.g., Farrell, 206 F.3d at 279-81, 286 (noting that temporal proximity can provide a basis to infer a causal link between the protected activity and the alleged retaliatory act, and explaining that the evidence applicable to the causation question is often probative at the pretext stage). Newell started working for Traditions in October 2010, and she testified that she began mentioning potential FHA violations "very shortly after [she] started." Supp. App. 171. Newell was not placed on the 30-day action plan until March 2012 and was not fired until May 2012, more than a year after she began raising her FHA concerns. While the record shows that Newell raised her FHA concerns many times, including providing Nowakowski with information about the Fair Housing Council just days before she was terminated, the intervening disclosure of her statements about Traditions on her LVAIP board application interrupts any temporal causal link between her FHA advocacy and her termination. For this additional reason, Newell has not shown the reason for her termination was pretextual.[3]

III

plaintiff casts doubt on "a fair number of them." 32 F.3d at 764 n.7. Here, however, Traditions provided only three reasons for Newell's termination, one of which we have explained no reasonable jury could conclude was pretext. The other two reasons, namely Newell's alleged poor attitude and insubordination and the conflict of interest issue, were discussed directly with her as issues arose during her employment. Thus, this case does not involve the type of "bagful" of post-hoc rationalizations imagined in Fuentes.

[3] Although the evidence does not establish that Newell was terminated due to her FHA advocacy, the concerns she raised about Defendants' alleged practices are, to say the least, troubling.

11

For the foregoing reasons, we will affirm the order of the District Court granting summary judgment for Defendants.